**John Dale ENOCH, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–16812.**

Court of Criminal Appeals of Oklahoma.

Nov. 3, 1971.

Rehearing Denied Dec. 10, 1971.

Don Anderson, Public Defender, for plaintiff in error.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

John Dale Enoch, hereinafter referred to as defendant, was charged in the District Court of Oklahoma County, Oklahoma with the offense of Murder. He was found guilty of the crime of Manslaughter in the First Degree, After Former Conviction of a Felony. His punishment was fixed at ninety-nine (99) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Ilene Enoch, the wife of the deceased, testified that the defendant and her husband were double cousins. On September 13, 1970, around 7:30 p. m., she and her late husband were at the Eagle Nest Bar. The defendant entered and said to her husband, "Charlie, I want to see you outside." (Tr. 18) She followed the two men outside, wherein the defendant began "cursing her out" and "running her down." (Tr. 18) The defendant's mother

and the deceased's mother drove up, and her mother-in-law told her to go inside. She went back inside the bar, and after approximately two minutes heard a gun go off. She ran to the door and saw her husband lying in the front, wounded by a shot gun blast, and the defendant was going back to his car carrying a shot gun. Ilene ran inside the bar, picked up two cue balls, and threw them at the defendant's automobile. The defendant reloaded the gun and chased her back into the bar, and she testified that "he was going to blow my head off." (Tr. 21) The defendant fired a shot into the bar, and she ran to the back to hide. In cross examination, the defendant admitted several prior convictions of vagrancy by prostitution, drunkenness, narcotics, and assault with a dangerous weapon.

Dr. John E. Pless, pathologist, testified that he performed an autopsy on the deceased. He found shot gun pellet wounds on the face, shoulders, and upper torso. Dr. Pless testified that in his opinion, the cause of death was penetration by the pellets of the vein, resulting in air being sucked into the blood stream and air embolism, in addition to bleeding into the chest cavity. He testified that the alcoholic content of the blood of the deceased was .22%.

Officer Robertson testified as to taking various photographs at the scene and identified empty shot gun shells and a shot gun.

Officer Birdwell testified that he answered a call to the bar at approximately 7:30 p. m. that evening, and observed the body on the ground in front of the bar. He put out a radio call and description of the defendant.

Officer Gunter testified that he received a radio call and observed the defendant leaving a house. He arrested the defendant and advised him of his rights against self-incrimination, wherein the defendant showed them a shot gun hidden under the sink in the house.

Mary Lois Sparks testified that she was at the Eagle Nest Bar on the evening in question and observed Ilene and Charles Enoch. The defendant walked in and back out, followed by Charles and Ilene. Ilene returned shortly, and she heard a "big blast." She ran back into the bar, and shortly thereafter another shot was fired into the bar.

Eugene Hulsey testified that he was watching television at his home across the street from the Eagle Nest Bar about 7:30 that evening. He heard an argument and saw that it was between Charles Enoch, the defendant, and Ilene. The defendant went to his car, a Mercury station wagon, and got a shot gun, returned to the argument, then put the gun back into the car and started to leave. The car would not start and two other persons came over and raised the hood and started working on the car. The defendant started a fight with them, and they left. The defendant and deceased started arguing again, and the defendant went back to the car, got the gun and loaded it while standing beside the car. He walked around the car, walked up to the deceased, started arguing with him and then shot him. The defendant then went back to the car, loaded the gun and walked toward the bar and fired a shot inside the bar through the door.

Earl Powell testified that he lived upstairs adjacent to the Eagle Nest Bar, and that he was standing on the balcony that evening. He saw the defendant go to his car, put a shell in his gun, then run back up to the door and fire a shot. The defendant then reloaded, put in another shell, and fired a second shot. Powell hollered down to the defendant, "John, what are you doing?"; wherein the defendant looked at him and said, "I am tired of them messing with me so I think I will just kill them all." (Tr. 127) The defendant then got into a pickup and started to leave. A woman ran out of a nearby laundry and grabbed the door handle of the pickup, whereupon the defendant then shot a window out of the laundry and drove off.

For the defendant, Fredona Reeves testified that she was the defendant's aunt and the mother of Charles Enoch, the deceased. She drove by the Eagle Nest Bar the afternoon of September 13 and saw Charles, the defendant, and Charles' wife out in front and stopped. Charles' wife and the defendant were quarreling. The defendant asked Charles, "Are you ready to go?" and then went to his car, got a shot gun and started walking past Charles toward the door of the bar. As the defendant passed her, she grabbed the gun. The defendant shoved her away and returned to the car. He appeared to be very intoxicated. His car would not start, and when a bystander tried to help the defendant, he began scuffling with him. She had turned and was talking to Charles when a shot was fired and Charles fell. She was also struck by some of the pellets. The defendant started back to his car, and she went in the bar to telephone for an ambulance. She heard other shots fired but did not see anything.

Laverne Cannon testified that she was the defendant's mother and Fredona Reeves' sister. Mrs. Reeves and she drove by the Eagle Nest Bar that evening and observed Charles, the defendant, and Ilene standing out in front. They stopped and got out. Ilene was drunk and quarreling with Charles. Ilene went in the bar and the defendant asked Charles, "Are you ready to go?" The defendant got the gun, and as he passed Mrs. Reeves, she grabbed at the gun asking him to go home. He returned to the car and put the gun down saying, "We were going hunting." The car would not start and the defendant fought with a bystander who tried to help. After tinkering with the engine a little, the defendant returned to the driver's side and "just kinda unexpectedly reached in there and jerked that gun out and as he jerked it, it went off." (Tr. 190) She testified that the defendant was extremely drunk and did not aim the gun. The defendant then walked toward a pickup, and as he neared the door of the bar, "he just turned his hand out kinda in an easterly direction and fired." He got into the pickup, and as he drove past the laundry, she heard another gun shot.

James R. Winters was called in rebuttal and testified that he was at the scene of the arrest and took the defendant to the city jail. He described the physical condition of the defendant as normal, that his speech was not slurred, and there was no odor of alcohol about him. He stated that, in his opinion, the defendant was not intoxicated.

Officer Birdwell was recalled and testified that he observed the defendant incarcerated in the city jail. He testified, in his opinion, that the defendant had complete control of his actions and was not intoxicated in such a manner as he would not know what he was doing.

■ The first proposition asserts that the trial court erred in failing to instruct adequately on the defense of accident. The Court's instructions concerning the theory of accident were as follows:

"Instruction 9: The taking of human life is excusable homicide when committed by accident and misfortune in the heat of passion upon any sudden and sufficient provocation, or upon a sudden combat, providing no undue advantage is taken, nor any dangerous weapons used, and that the killing is not done in a cruel or unusual manner, or when committed by accident and misfortune and doing a lawful act, by lawful means, with usual and ordinary caution, and with any unlawful intent.

"Instruction 15: If there exist in your minds a reasonable doubt under these Instructions that the defendant is guilty of the crime with Murder, or of the crime of Manslaughter in the First Degree, or the crime of Manslaughter in the Second Degree, or should find from the evidence under these Instructions, that the acts of killing said Charles Enoch by the defendant was excusable homicide, as defined in these Instructions, it will be your duty to return a verdict of not guilty and thereby acquit this defendant."

Defendant argues that this Instruction merely follows the language of the statute, Title 21 O.S.1961, § 731, and does not meet the requirements of Nelson v. State, Okl. Cr., 288 P.2d 429. In *Nelson*, supra, we held that where accident was a defense that the Court's instructions on an excusable homicide, based on the language of the statutes, does not affirmatively present his defense of accidental homicide. We have carefully examined *Nelson* supra, and are of the opinion that the same is distinguishable from the case at bar. In *Nelson* the defendant offered two instructions as to his theory of accident, which were possibly subject to criticism; we stated that they were sufficient to call the trial court's attention to the nature and theory of his defense. In the instant case, the defendant requested fourteen instructions, none of which included the defense of accidental or excusable homicide. The defendant's requested instructions included lesser offenses and the defense of intoxication. We have consistently held that where counsel is not satisfied with instructions that are given, or desires the court to give any particular instructions, or to more definitely or sufficiently state any proposition embraced in instructions, it is the duty of counsel to prepare and present to the court such desired instructions and request that they be given. In the absence of such a request, the Court of Criminal Appeals will not reverse a case if instructions generally cover the subject matter of inquiry. Schanpansky v. State, Okl.Cr., 478 P.2d 912; Carter v. State, Okl.Cr., 376 P.2d 351; Clark v. State, Okl.Cr., 383 P.2d 236; Wolf v. State, Okl.Cr., 375 P.2d 283; Buie v. State, Okl.Cr., 368 P.2d 663. It is the opinion of this Court that the Instructions generally cover the subject matter of inquiry, and further, that defendant's attempt to raise this proposition for the first time on appeal is untimely. We, therefore, find this proposition to be without merit.

The final proposition asserts that the punishment is excessive. We have repeatedly held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each case, and the Court of Criminal Appeals does not have the power to modify a sentence, unless we can conscientiously say that under all facts and circumstances the sentence is so excessive as to shock the conscience of this Court. Roberts v. State, Okl.Cr., 473 P.2d 264. From the foregoing statement of facts, and taking into consideration the defendant's three prior Felony convictions, we cannot conscientiously say that the sentence imposed shocks the conscience of this Court.

In conclusion, we observe the Record is free of any error which would require reversal or justify modification. The judgment and sentence is accordingly affirmed.

BRETT, J., concurs.